UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ISRAEL HERNANDEZ, JR., <br> REG. NO. 34888-180, <br><br> Movant, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent, | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | SA-15-CA-1126-DAE (HJB) <br><br> SA-12-CR-899(2)-DAE |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Senior United States District Judge David A. Ezra:**

This Report and Recommendation concerns Israel Hernandez Jr.'s Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Docket Entry 167.)[1] Pursuant to an informal referral of the above-styled and numbered cause to the undersigned United States Magistrate Judge on January 11, 2016, and consistent with the authority vested in United States Magistrates under the provisions of 28 U.S.C. § 636(b) and Rule 1(d) and (e) of the Local Rules for the Assignment of Duties to United States Magistrates, Appendix C to the Local Court Rules for the Western District of Texas, the following report is submitted for your review and consideration.

**I.  Jurisdiction.**

The Court exercised jurisdiction over the original criminal case pursuant to 18 U.S.C. § 3731. It has jurisdiction over Hernandez's Motion to Vacate pursuant to 28 U.S.C. § 2255.

---

[1] Unless otherwise specified, all "Docket Entry" citations refer to SA-12-CR-899-(2)-DAE.

## II. Background.

*The Instant Offense.* Hernandez was charged in October 2012 with conspiring with two other individuals to distribute 500 grams or more of a mixture involving methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 846. (Docket Entry 19.) The imprisonment range Hernandez faced under § 841(b)(1)(A) was 10 years to life; however, because Hernandez had two prior federal drug offenses, he could have been subject to a sentence enhancement requiring either a minimum of 20 years' imprisonment, or an enhancement requiring mandatory life imprisonment without parole. *See* 21 U.S.C. § 851.

Hernandez entered into a agreement to plead guilty to the charge in the indictment; in exchange the Government agreed not to file a § 851 enhancement. (Docket Entry 81, at 1, 9.) The Government also agreed to consider filing a motion for downward pursuant to United States Sentencing Commission policy statement §5K1.1, in exchange for Hernandez's cooperation. (*See* Docket Entry 121.) As part of the agreement, Hernandez waived his right to appeal his sentence or challenge his conviction in any collateral proceeding, except on constitutional grounds of ineffective assistance or prosecutorial misconduct. (Docket Entry 81, at 5–6.)

Hernandez pleaded guilty before a United States Magistrate Judge on June 3, 2013. In the agreed factual basis in support of Hernandez's guilty plea, the facts of the case were set out as follows:

> Beginning on or about March 1, 2012, the exact date unknown, and continuing until on or about September 15, 2012, in the Western District of Texas, Defendants, CARLOS RUIZ, ISRAEL HERNANDEZ, Jr., and ANDREW C. KESSLER, II, conspired and agreed together and with others to distribute a controlled substance, which offense involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance.

2

On Thursday, September 13, 2012, a court-authorized Title III wiretap on RUIZ' telephones (the "T-III") revealed that "Gordo," later identified as Israel HERNANDEZ, JR., was planning to distribute fifteen (15) pounds of crystal methamphetamine ("ICE") to San Antonio resident Carlos RUIZ, in Brownsville, Texas. According to the T-III, RUIZ hired a courier known as "Drew," later identified as Andrew C. KESSLER, II, to drive from San Antonio to transport the crystal methamphetamine from Brownsville, Texas, to Laredo, Texas. The T-III revealed that RUIZ and KESSLER were making arrangements to meet on the morning of Friday, September 14, 2012, at a local convenience store located near RUIZ' residence in San Antonio, Texas.

On Friday, September 14, 2012, surveillance units observed KESSLER, driving a white, 1998 Chevrolet pickup truck, along with his 16 year old son, as they met with RUIZ in the parking lot of the convenience store. Surveillance units followed KESSLER, his son, and RUIZ from San Antonio, Texas, until they arrived at a Wal-Mart store in Laredo, Texas. The T-III revealed that RUIZ was to meet with HERNANDEZ at the Wal-Mart where HERNANDEZ could personally see the driver and provide travel expenses to RUIZ. According to the T-III, the meet location changed to a Shell gas station across the street from the Wal-Mart where agents observed RUIZ meeting with HERNANDEZ, who [w]as driving an older model, green Ford pickup truck bearing Texas license plates AD8-3548.

At the conclusion of the meeting, HERNANDEZ departed the store south bound on U.S. Highway 83 toward Zapata, Texas, and in the direction of the Rio Grande Valley. Surveillance units followed KESSLER, his son, and RUIZ, who were then riding in KESSLER's white truck as they traveled south bound on U.S. Highway 83. Surveillance units observed HERNANDEZ waiting at the side of the road in his green Ford until KESSLER turned south on Highway 83. Agents lost visual surveillance of HERNANDEZ, who continued south bound on U.S. 83, but maintained surveillance on KESSLER's vehicle until it arrived in Brownsville, Texas. At that time, RUIZ was observed entering a blue Chevrolet Tahoe, later identified as a vehicle used by HERNANDEZ. Surveillance followed HERNANDEZ and RUIZ in the blue Tahoe where they met with an unidentified subject in a white Nissan sedan bearing Mexican license plates.

At approximately 7:45 P.M., RUIZ, riding in the blue Tahoe, returned to meet with KESSLER and his son, where RUIZ gave KESSLER a spare tire/wheel (loaded with 15 pounds of meth) that KESSLER attempted to bury

in the bed of his truck. The T-III revealed that the spare tire contained a large quantity of "ICE." Agents observed RUIZ entering the passenger side of the Tahoe and depart the area northbound on the access road of U.S. 83, as KESSLER and his son followed RUIZ in KESSLER's truck. Agents followed KESSLER on U.S. 83 until he arrived in Mission, Texas.

At approximately 8:55 P.M., DEA Task Force Agents driving marked law enforcement vehicles initiated a traffic stop on KESSLER on the northbound access road of U.S. 83 near La Homa Road, in Mission, Texas. At that time, TFAs identified KESSLER as the driver and his son as the passenger. TFAs located the spare tire in the bed of the truck which appeared to be heavy and did not bounce as a normal spare tire. According to the TFAs, the spare tire appeared to contain loose items moving within the tire. Upon closer inspection TFAs located thirteen (13) bundles of "ICE," weighing approximately fifteen (15) pounds, which field tested positive for methamphetamine. TFAs released KESSLER and his son without incident once KESSLER denied ownership of the drugs.

On Friday, September 14, 2012, immediately following the traffic stop and seizure, KESSLER made telephonic contact with RUIZ and told him the story about being stopped by the police who "stole" the drugs (the original plan was to conduct the traffic stop while RUIZ followed KESSLER, so that RUIZ would know that the police took the drugs, but RUIZ stopped to do something and missed seeing the seizure). Throughout Friday night and Saturday, the T-III revealed that HERNANDEZ and RUIZ believed that KESSLER stole their drugs.

On Saturday, September 15, 2012, the T-III revealed that HERNANDEZ and RUIZ were planning on abducting KESSLER in San Antonio and forcing him to "return" the methamphetamine. The T-III revealed that HERNANDEZ and RUIZ made plans with other individuals who agreed to assist in abducting KESSLER in order to retrieve the missing drugs.

On Saturday, September 15, 2012, agents located KESSLER in San Antonio and advised him of the potential danger. Upon being read his rights, KESSLER freely and voluntarily provided statements implicating himself as a courier who was to be paid about $1,200.00 to transport six (6) pounds of "ICE" for RUIZ to Laredo, Texas. KESSLER admitted that he was contracted on several prior occasions by RUIZ, who he only knew as Hector, to transport drugs from Laredo to San Antonio.

> On Saturday, September 15, 2012, the T-III revealed that HERNANDEZ and RUIZ were planning to meet at the Denny's restaurant near Culebra Road and IH-410 in San Antonio, Texas. At that time, DEA and San Antonio Police Officers arrested HERNANDEZ and RUIZ; three (3) others were detained for investigative purposes.
>
> Upon being read his rights, HERNANDEZ admitted to being a drug transportation coordinator. HERNANDEZ stated that he contracted RUIZ to transport six (6) kilograms of cocaine from Brownsville, Texas, to Laredo, Texas. HERNANDEZ stated that he and RUIZ were each going to be paid $600 per kilogram to handle the transportation of the drugs.
>
> The methamphetamine was tested by chemists, and was determined to be methamphetamine, a schedule II controlled substance, with a net weight of 5,804 grams at 99.9% purity.

(Docket Entry 81, at 2–5; *see also* Docket Entry 145, at 10–11.) The Magistrate Judge recommended that the plea be accepted, and this recommendation was accepted by the District Court on June 5, 2013, without objection from either party. (Docket Entries 89, 91.)

***Revocation of Supervised Release in Prior Offenses.*** More than a month after Hernandez's guilty plea was accepted, jurisdiction was transferred to the Western District of Texas over two federal supervised release terms that Hernandez was serving for prior convictions. In one case, he had previously been convicted in 2003 of conspiring to possess with intent to distribute more than 100 kilograms of marijuana in the Northern District of Florida. (*See* SA-13-CR-572-DAE, Docket Entry 1.) In the other case, he had been convicted of offenses in Mexico in 2001, and transferred to the United States to serve his sentence. (*See* SA-13-CR-568-DAE, Docket Entry 1.) Until their transfer to the Western District, both release terms were being supervised in the Southern District of Texas; a probation officer sought revocation in each of these cases, based in part on Hernandez's new criminal activity, and judges in the Southern District of Texas issued arrest warrants for each

of the revocation petitions. (*See* SA-13-CR-568-DAE, Docket Entry 2; SA-13-CR-572-DAE, Docket Entry 2.)

***Sentencing and Appeal.*** In advance of sentencing in the instant case, the probation officer prepared a presentence report for the district court. In the report, the office determined that Hernandez was a "career offender" under U.S. Sentencing Guideline ("U.S.S.G.") §4B1.1, based on his previous federal marijuana conspiracy conviction, as well as a 1993 state conviction for possessing 400 or more grams of cocaine with intent to distribute. (Docket Entry 103, at 9–10.) Normally, a career-offender designation would enhance the defendant's offense level in a case like Hernandez's to a level 37. (*See id.*) However, due to the large amount of methamphetamine involved in Hernandez's offense, his guideline offense level was already calculated at 39, and thus the career-offender designation had no effect on his offense level. (*Id.* at 10.) The career-offender designation did affect his criminal history score, increasing his criminal history category from IV to VI. (*Id.* at 14.) At offense level 39, this criminal history produced a guideline imprisonment range of 360 months to life in prison. (*Id.* at 19.)

Defense counsel objected to the probation officer's calculation of both Hernandez's offense level and his criminal history score. At sentencing, the Government conceded one defense objection, and the Court overruled the others; this set Hernandez's offense level at 37. (Docket Entry 144, at 6, 11.) At level 37, Hernandez's guideline imprisonment range remained at 360 months to life. (*See* Docket Entry 144, at 11; Docket Entry 129.) The Court departed downward on the Government's motion, imposing a sentence of 300 months' imprisonment, to be followed by 5 years' supervised release. (Docket Entries 121, 128; Docket Entry 144, at 7, 16.)

Immediately sentence was imposed, the Court held a hearing on the two petitions for revocation. Hernandez did not contest revocation and the Court imposed sentences of 24 months' imprisonment in case SA-13-CR-568-DAE and 33 months' imprisonment in case SA-13-CR-572-DAE. (*See* SA-13-CR-572-DAE, Docket Entry 13.) The Court ordered the revocation sentences to run concurrently with each other, but—over the objection of defense counsel—it required that 30 months of the revocation sentence in SA-13-CR-572-DAE to run consecutive to the new 300-month sentence imposed in SA-12-CR-899-DAE. (*Id.*; *see* Docket Entry 144, at 21–23.)

Hernandez appealed in both the instant case and the two revocation cases; all three were consolidated for appeal. His appointed counsel filed an *Anders* brief[2] and the appeals were dismissed as frivolous. (Docket Entries 133, 157.)

***The Motion to Vacate.*** Hernandez, through retained counsel, filed a Motion to Vacate Sentence in the instant case, SA-12-CR-899(2)-DAE. (Docket Entry 167.) No motions have been filed in connection with either of the revocation sentences.

In his motion, Hernandez raises three claims: (1) his guilty plea was not knowingly made, because he was incorrectly informed of the consequences of his plea; (2) he received ineffective assistance of counsel during his proceedings in the district court; and (3) he received ineffective assistance of counsel on appeal. (*See* Docket Entry 167, at 6–9; Docket Entry 168, at 5–18.)[3] The

---

[2] *See Anders v. California*, 386 U.S. 738 (1967).

[3] Hernandez also makes a claim of "cause and prejudice" to support his motion (Docket Entry 168, at 4–5.) However, such a claim is not a freestanding constitutional, jurisdictional, or other basis for a § 2255 motion; instead, it provides grounds upon which to overcome procedural default. *See* Part III, *infra*.

7

Government responds that none of the grounds asserted by Hernandez justify vacating his sentence in this case. (*See* Docket Entries 172, 174.)

**III. Analysis.**

Title 28 U.S.C. § 2255 provides relief for a convicted federal criminal defendant who can establish that either: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004); *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996). To obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) "cause" excusing his double procedural default, and (2) "actual prejudice" resulting from the errors of which he complains. *United States v. Frady*, 456 U.S. 152, 167–68 (1982).

Hernandez challenges the validity of his guilty plea, and he contends that he received constitutionally inadequate counsel both in the trial court and on appeal. Each of these claims is discussed below.

**A.** *Whether Hernandez's Guilty Plea Was Invalid.*

A guilty plea will be upheld on collateral review if entered into voluntarily, intelligently, and knowingly. *United States v. Hernandez*, 234 F.3d 252, 254 (5th Cir. 2000); *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985); *United States v. Juarez*, 672 F.3d 381, 385 (5th Cir. 2012).

"Ordinarily, a defendant will not be heard to refute his testimony given under oath when pleading guilty." *United States v. Fuller*, 769 F.2d 1095, 1099 (5th Cir. 1985). "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977); *see also United States v. Long*, 722 F.3d 257, 264 (5th Cir. 2013). The representations made by the defendant, his lawyer, and the prosecutor at a plea hearing, as well as the findings made by the trial judge accepting the plea, constitute a formidable barrier to any subsequent collateral attack. *Blackledge*, 431 U.S. at 73–74; *Montoya*, 226 F.3d at 406. Any documents signed by the defendant at the time of the guilty plea are likewise entitled to "great evidentiary weight." *United States v. Abreo*, 30 F.3d 29, 32 (5th Cir. 1994); *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985).

In this case, Hernandez claims that he pleaded guilty without knowing the consequences of his plea, in violation of Federal Rule of Criminal Procedure 11(c)(1) and due process. He contends that, when he pleaded guilty, petitions for revocation were pending on each of the terms of supervised release he was serving, and that the magistrate judge erred in failing to advise him of the consequences his plea could have on these revocation petitions. (*See* Docket Entry 168, at 7.)

Hernandez's claim is legally unsupported. Revocation of pending release terms is not the sort of collateral consequence of a plea of which a defendant generally need be advised. *Cf. Sanchez v. United States*, 572 F.2d 210, 211 (9th Cir. 1977) (possible revocation of current parole term); *United States v. Presley*, 907 F.2d 151, unpub. op., 1990 WL 94882, at *2 (6th Cir. 1990) (applying *Sanchez* on question regarding probation revocation); *see generally United States v. U.S. Currency in the Amount of $228,536*, 895 F.2d 908, 915 (2d Cir. 1990) (collecting cases). The cases cited by Hernandez in support of the contrary position (*see* Docket Entry 168 at 7) are all clearly

9

distinguishable. None of the cases Hernandez cites involved collateral revocation proceedings; instead, they involved misinformation as to the penalties faced on the very charge to which the defendant had pleaded guilty. *See United States v. Powell*, 269 F.3d 175 (3d Cir. 2001) (misinformation regarding the length of supervised release defendant faced on charge to which he pleaded); *United States v. Rivera-Maldonado*, 560 F.3d 16 (1st Cir. 2009) (same); *United States v. Milton*, 333 F. App'x 474 (11th Cir. 2009) (same; imprisonment term defendant faced).

Even if courts were required to advise defendants regarding the consequences of the plea upon separate, pending revocation petitions, Hernandez's claim would fail. This is because, at the time of his guilty plea, no revocation proceedings were pending. The revocation petitions were not filed until August 2013, approximately two months after Hernandez pleaded guilty. (*See* SA-13-CR-568-DAE, Docket Entry 2; SA-13-CR-572-DAE, Docket Entry 2.) Indeed, at the time of Hernandez's plea, neither of his supervised release terms was under the jurisdiction of the Western District of Texas. Thus, even if revocation in separate cases might be the sort of collateral consequence of which a defendant should be made aware, in this case such consequences were no more than speculative at the time of Hernandez's plea.

Even if all the obstacles set out above could be overcome, Hernandez faces another hurdle: procedural default. Hernandez did not object to the recommendation that his guilty plea was knowing and voluntary; nor did he seek to withdraw his plea after the supervised release terms were transferred to this District, and the revocation petitions filed. To the contrary, both parties made clear at sentencing that the plea agreement did not cover the revocations in this case, without any objection from Hernandez. (*See* Docket Entry 144, at 2–3.)

In light of Hernandez's procedural default, he would have to show both "cause" and "actual prejudice" before his claim could be considered. A defendant may establish "cause" for his procedural default by showing "that some objective factor external to the defense prevented him from raising on direct appeal the claim he now advances." *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996). Included among such factors is ineffective assistance of counsel in the constitutional sense. *Id.* To show "prejudice," a defendant must demonstrate that, but for the claimed error, he might not have been convicted. *See id.* at 994. In the case of a guilty plea, the defendant must show that absent the error, he would not have pleaded guilty, but would have insisted on going to trial. *See id.*

In this case, Hernandez pleaded guilty under agreements that avoided a mandatory term of life imprisonment, and resulted in a five-year reduction in his sentence. (*See* Docket Entry 81, at 9; Docket Entry 144, at 7.) Even if he could somehow show ineffective assistance, or some other cause for his failure to seek to withdraw his guilty plea, he cannot show prejudice to allow him to go forward on his defaulted claim.

B.   *Whether Hernandez Received Ineffective Assistance in the District Court.*

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel." This requirement is violated when legal representation (1) falls below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case; and (2) gives rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To satisfy the first prong of *Strickland*, a convicted defendant must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. 466 U.S. at 687–91. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009); *Strickland*, 466 U.S. at 688–89. Accordingly, courts are extremely deferential in scrutinizing the performance of counsel, and they must make every effort to eliminate the distorting effects of hindsight, looking instead at the actions of counsel from counsel's perspective at the time. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). It is presumed that counsel made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694.

In addition to the challenge to his guilty plea discussed above, Hernandez raises two other issues of ineffective assistance: (1) that counsel failed to challenge the wiretap evidence in his case; and (2) that counsel failed to effectively challenge his classification as a career-offender at sentencing. Each of these claims fails.

1. *Failure to challenge wiretap evidence under Title III.*

Hernandez claims that his counsel provided ineffective assistance by failing to present any pretrial challenge under 18 U.S.C. § 2515, to the wiretap evidence that the Government used against

him. (Docket Entry 168, at 10–13.) Of course, as with any other motion, a challenge under § 2515 need not be made in every case. As the Government points out, counsel's decision to forego an evidentiary challenge could well have been grounded in strategy in this case, as counsel instead successfully negotiated for a plea agreement that avoided an enhancement to life imprisonment and ultimately resulted in a sentence five years below the applicable guideline imprisonment range. (*See* Docket Entry 172, at 13.) "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *see also Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (same). Hernandez has presented no evidence whatsoever to show that counsel's decision in this case was not an informed or strategic one. He therefore cannot overcome the presumption that counsel's representation was objectively reasonable.

Even if Hernandez could carry that burden, however, he cannot show prejudice. Hernandez does not present a legitimate basis on which to challenge the wiretap evidence in his case. All that he claims is that, while the Government "may have complied with" the procedural requirements for obtaining and using wiretap evidence, "no one can be sure as counsel did not review these requirements through the light of adversarial testing." (Docket Entry 168, at 12.) Without any claim as to what that "adversarial testing" might have shown, or any claim that there was a legitimate basis on which to challenge the Governments' wiretap evidence, Hernandez's speculative assertion is insufficient.

### 2. *Failure to challenge Hernandez' status as a career-offender.*

Hernandez also claims that counsel was deficient for failing to challenge his status as a career- offender. (Docket Entry 168, at 13–15.) A successful challenge to application of the career-offender guideline could have affected Hernandez's sentence, as it would have reduced his criminal history category from VI to IV, and his resulting guideline range from a minimum of 360 months to a minimum of 292. *See* U.S.S.G. Ch. 5, Pt. A (sentencing table). Since the district court specifically departed to a sentence 60 months below the guideline range based on the Government's motion, there is a reasonable probability that, if defense counsel had failed to present a legitimate challenge to the career-offender guideline, Hernandez's sentence might have been lower.

Contrary to Hernandez's assertion, however, there was no legitimate challenge that defense counsel failed to present. Defense counsel did in fact object to the career-offender designation; that objection was overruled by the Court. (Docket Entry 103-2; Docket Entry 144, at 6.) Hernandez now claims that there was a different objection to the career-offender guideline that counsel failed to make: he asserts that his 1993 Texas conviction for possession of cocaine with intent to deliver did not qualify as a "controlled substance offense" for purposes of the career-offender designation. (Docket Entry 168, at 14.) This claim fails.

Under guideline §4B1.1, a defendant is a career-offender if "the instant offense of conviction is a felony that is... a controlled substance offense," and "the defendant has at least two prior felony convictions of a controlled substance offense." U.S.S.G. §4B1.1(a). For purposes of the career-offender guideline, a "controlled substance offense" is defined as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or

the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. §4B1.2(b). Hernandez's Texas conviction for possession of cocaine with intent to deliver qualifies as a controlled substance offense under this definition. *United States v. Ford*, 509 F.3d 714, 717 (5th Cir. 2007).[4] Since Hernandez was properly categorized as a career-offender, counsel did not provide ineffective assistance in failing to make the objection Hernandez has now put forward.

Hernandez also claims that the Government agreed in the plea agreement not to advocate a career-offender adjustment, and that defense counsel was ineffective for failing to object to career-offender status based on the plea agreement. (Docket Entry 168, at 14.) Hernandez is incorrect. As noted above, the plea agreement did provide that the Government would not seek a statutory enhancement under 21 U.S.C. § 851. (Docket Entry 81, at 9.) But the Government's agreement did not reach a career-offender enhancement under the sentencing guidelines; to the contrary, the plea agreement specifically reflected acknowledgment that the Government's "agreement does not preclude a finding by the [probation officer] or the Court that [Hernandez] is a 'Career Offender' under USSG 4B1.1." (*Id.*) As the Fifth Circuit held on closely similar facts in *United States v. Harrison*, "[t]he record shows that the Government complied with its agreement not to seek a statutory sentence enhancement under § 851," and it "correctly argues that a statutory sentence

---

[4] The cases cited by Hernandez are distinguishable: both involved convictions for mere delivery, without proof of possession. *See United States v. Price*, 516 F.3d 285, 287 (5th Cir. 2008); *United States v. Gonzales*, 484 F.3d 712, 714 (5th Cir. 2007). Unlike Hernandez's possession offense, a mere "delivery" offense in Texas may be based on nothing more than an offer to sell, without any proof that the defendant actually possessed contraband. *See Gonzales*, 484 F.3d at 714–15.

enhancement under § 841(b) and § 851 is different from a career-offender sentence enhancement under § 4B1.1 of the Guidelines." 538 F. App'x 510, 512 (5th Cir. 2013).

For all these reasons, Hernandez's ineffective-assistance claims against his trial counsel fail.[5]

C.  *Whether Hernandez Received Ineffective Assistance on Appeal.*

Finally, Hernandez claims that he received ineffective assistance on appeal. A defendant is constitutionally entitled to effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 395 (1985). The *Strickland* two-prong standard applies to claims of ineffective assistance of appellate counsel. *Duhamel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992). Hernandez asserts that appellate counsel was ineffective because he failed to raise the various issues discussed above, and instead filed an *Anders* brief, asserting that no non-frivolous issue was presented in Hernandez's case.

To prevail on a claim of ineffective assistance by appellate counsel, a petitioner must identify, with specificity, the grounds for relief that he claims should have been included in his appellate brief, and demonstrate a reasonable probability that, but for appellate counsel's failure to include those points of error, the defendant would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Hernandez cannot make this showing. As discussed above, none of Hernandez's claims have merit; accordingly, there is no reasonable probably that, had they been raised, Hernandez would have

---

[5] Hernandez also claims that trial counsel was ineffective "in addressing the court's disposition of the two pending petitions for revocation." (Docket Entry 168, at 15.) This Report does not address this claim, because the revocation sentences are not before the Court in this case. The revocations of supervised release were the subject of separate judgments in separate cases; accordingly, if Hernandez wishes to seek relief from those sentences, he "must file a separate motion covering each judgment." RULES GOVERNING SECTION 2255 PROCEEDINGS, Rule 2(d). He has not done so.

prevailed. Hernandez's guilty plea waived all non-jurisdictional issues, including any potential challenge to wiretap evidence. *See United States v. Salazar*, 323 F.3d 852, 855 (10th Cir. 2003) (an "unconditional guilty plea effectively waived any challenge to the legality of the wiretaps"). And his sentence-appeal waiver foreclosed any challenge to his sentence, including his categorization as a career-offender. *United States v. Smith*, 143 F. App'x 559, 561 (5th Cir. 2005). Thus, he cannot show that appellate counsel failed to raise an issue that could reasonably have prevailed on appeal.

## IV. Recommendation.

For the reasons set out above, I recommend that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Docket Entry 167) be **DENIED**.

## V. Instruction for Service and Notice for Right to Appeal.

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown*

& *Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on October 18, 2016.

Henry J. Bemporad
United States Magistrate Judge